```
UNITED STATES DISTRICT COURT
  DISTRICT OF RHODE ISLAND
```

_____
                                   )
                                   )
In re IDC Clambakes, Inc.,         )
                                   )    C.A. No. 10-267 S
        Debtor.                    )
                                   )
_____)

**OPINION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

This cross-appeal from the Bankruptcy Court's Decision and Order begins the end of the protracted, litigious relationship of the parties concerning an area of Goat Island, on a portion of Goat Island South Condominium, known as the "Reserved Area" in Newport, Rhode Island. The Appellants/Cross-Appellees are Goat Island South Condominium Association, America Condominium Association, Capella South Condominium Association, and Harbor Houses Condominium Association (collectively, the "Associations"), and the Appellee/Cross-Appellant is Debtor IDC Clambakes, Inc. ("Clambakes"). Thomas Roos is the sole shareholder of Clambakes, IDC Properties, Inc. ("Properties"), and IDC, Inc.

I. Background

To understand the issues in this cross-appeal, a brief overview of the underlying facts and procedural history is

warranted. The following, largely undisputed, narrative of the relevant events is derived from the Bankruptcy Court's opinion:

> IDC, Inc. and Properties are the successors in interest to Globe Manufacturing Co., the declarant of a Newport, Rhode Island, condominium complex situated on Goat Island, consisting of approximately twenty-three acres. The master declaration reserved to the declarant the right to convert, <u>inter alia</u>, the Reserved Area (also referred to as the North Unit) to a master unit and to construct improvements thereon, until December 31, 1994. . . . Properties failed to timely exercise said development rights, but instead attempted to extend the development rights deadline through a series of amendments to the master declaration.
> Between 1996 and 1998, meetings, discussions, and negotiations took place between IDC, Inc., Properties, Roos, and the Associations and their attorneys concerning, <u>inter alia</u>, the validity of the amendments, fee assessments and voting schemes. On January 5, 1998, the Associations, Properties, IDC, Inc., and Roos, entered into a Tolling Agreement which preserved the Associations' claims relative to the amendments, development rights, the Rhode Island Condominium Act, construction, repair and improvements, and the allocation of common element expenses. This agreement was extended several times and remained in effect through May 31, 1999. Clambakes was not a party to the original Tolling Agreement, nor to any of its extensions.
> Clambakes [came] into existence [on] April 18, 1996. . . . It is agreed that Clambakes is a separate and distinct corporation with separate assets and liabilities, and that Roos is the sole shareholder and President of both Clambakes and Properties.
> In late 1997 and throughout 1998, while the Tolling Agreement was in effect, Properties made plans and preparations to construct an opulent banquet facility on the Reserved Area. Prior to the start of construction, in October 1997, the America Condominium Association raised concerns with the City of Newport Zoning Officer about the issue of parking on Goat Island to handle the proposed Clambakes operation. The Zoning Officer's response was "that the proposal is allowed under the zoning code of the City of

2

Newport." See Debtor's Exhibit 21. Approximately four months later, upon the filing of the building permit for the construction of the facility, the America Condominium Association again raised the parking issue with the Newport Building Inspector. "It's our understanding that a permit application has been filed with your Office for the purpose of constructing a bldg. [sic] that would, among other uses, be used for clambakes. While we don't have a particular objection as to the land use with respect to the building itself, we do have a substantial problem with the parking requirements for that bldg., [sic] as well as for other commercial parking on and around that site." Debtor's Exhibit 63 (emphasis added).

On March 1, 1998, while the facility was still under construction, Properties entered into a twenty year lease with Clambakes, doing business as The Newport Regatta Club ("Regatta Club"). . . . In July 1998, an application was filed with the Board of License Commissioners to transfer the liquor license of Dorell, Inc. to IDC Clambakes, Inc., d/b/a The Newport Regatta Club. The issuance of the liquor license was delayed for several months at the request of, and pending the America Condominium's Zoning Board appeal, but the liquor license was ultimately approved. There is no evidence that any of the individual unit owners or the plaintiff Associations opposed the liquor license transfer to Clambakes. See Debtor Exhibits 66, 67. The only question raised by the Associations during the construction of the facility concerned the adequacy and/or logistics of parking.

On December 16, 1998, the Regatta Club's use and occupancy certificate was issued,[1] and wedding

---

[1] Nearly one year later, on October 20, 1999, America Condominium appealed the Newport building inspector's issuance of the building permit and certificate of occupancy on the grounds that it was in violation of a special use permit on the property, which appeal was subsequently denied. Am. Condo. Ass'n., Inc. v. Benson, No. 99-180, 2000 WL 33159156 (R.I. Super. May 19, 2000). The appeal did not raise any allegations of trespass against either Properties or Clambakes. Thereafter, America Condominium filed a lawsuit in Superior Court seeking a remand of the action to the zoning board, which request was likewise denied. Am. Condo. Ass'n v. Benson, No. CIV.A. NC99-

3

reception and banquet operations began. Thereafter, from mid-December 1998 until April 8, 2005, Clambakes operated the Regatta Club and paid rent to Properties pursuant to the terms of their lease. During this seven year period the Associations made no protest nor took any action to enjoin Clambakes' operation of its business or to express objection – overtly or otherwise – to Clambakes' possession and/or operation of the Regatta Club.

Approximately six months after Clambakes began operating the Regatta Club, on May 28, 1999 – three days before the expiration of the Tolling Agreement, the Associations filed a state court action against IDC, Inc., Properties and Roos individually, alleging, <u>inter alia</u>, violations of the Rhode Island Condominium Act, R.I. Gen. Laws § 34-36.1-1.01, <u>et seq.</u> (1956), and that the voting scheme used in amending and extending the development rights in the Reserved Area was contrary to law and was therefore ineffective. . . . [O]mitted from this lawsuit was Clambakes, . . . and Clambakes was never added as a party during the entire six year period that the <u>America</u> litigation wound its way through the Rhode Island Superior and Supreme Courts.

[A]lthough the Associations were suing Clambakes' lessor, they never contested Clambakes' right to possess and operate, nor ever objected to its operation, as lessee, of the Regatta Club. To the contrary, during the entire time in question, unit owners contracted with Clambakes to host private events at the Regatta Club under standard business terms and rates, and the Harbor Houses Condominium Association similarly used the Regatta Club to conduct its annual meetings. At no time did any unit owners, or the Harbor Houses Association, or the Associations notify Clambakes that it was operating without the consent of the owner, or assert any claims of trespass or unauthorized occupancy against it. Instead, they used and enjoyed the Club for seven years.

On October 15, 1999, nearly one year after Clambakes took possession of and began operating the Regatta Club, the Associations recorded a Notice of Lis Pendens in the land records for the City of

---

180, 2001 WL 1452781 (R.I. Super. Nov. 2, 2001). Clambakes was not a party to any of that litigation.

4

Newport against "IDC Properties, Inc., the present declarant and the record owner of the North Development Unit, the West Development Unit, and the South Development Unit," referencing the state court complaint seeking declaratory relief and money damages, see Plaintiff Exhibit E, again with no mention of Clambakes.

Soon after the Supreme Court's decision in America II in April 2005, holding that "title [to the Reserved Area and its structures] rested with the unit owners in common ownership from the creation of the condominium," 870 A.2d at 443, the Associations filed an Application for Writ of Execution for Possession and Writ of Ejectment, seeking for the first time to evict Properties, IDC, Inc., and Thomas Roos, see Debtor's Post Trial Memorandum, Composite Exhibit GG, but with still no mention of Clambakes in any of the papers.

On June 16, 2005, Clambakes filed the instant Chapter 11 case, initially trying to relitigate in this Court many of the same issues already decided against IDC, Properties and Roos in the state courts. When that strategy failed, Clambakes began in earnest to address its Debtor in Possession responsibilities, i.e., a plan was promptly confirmed, all creditors and fees were paid, and sufficient funds were placed in escrow to pay the Associations in full, if their claims are allowed. . . .

On July 11, 2005, a Chapter 11 trustee was appointed, and shortly thereafter, in order to allow the Debtor to complete its substantial summer event bookings scheduled from July 28, 2005 through October 31, 2005, filed an emergency motion requesting that he be authorized to operate the Regatta Club in the ordinary course and to make adequate protection payments to the Associations for its use and occupancy during the Debtor's busy season. . . . Negotiations followed, and on August 25, 2005, the Court approved a Consent Order settling the trustee's emergency motion, wherein the parties agreed that the trustee should continue to operate the Debtor's business in the ordinary course through November 5, 2005, in consideration of the payment of $450,000 as adequate protection for the use and occupancy of the premises for the period April 8, 2005 (the date of the Supreme Court decision declaring title in the unit owners),

5

through November 5, 2005 (the date of the last permitted event booking).

In re IDC Clambakes, Inc., 431 B.R. 51, 55-57 (Bankr. D.R.I. 2010).

On February 8, 2008, this Court remanded the case to the Bankruptcy Court after its initial decision on Clambakes' motion for summary judgment and appeal therefrom. Goat Island S. Condo. Ass'n, Inc. v. IDC Clambakes, Inc., 382 B.R. 178 (D.R.I. 2008). The Court instructed the Bankruptcy Court on remand to (1) ensure the disposition comported with due process requirements; (2) carefully adhere to the elements of trespass under Rhode Island law; and (3) reconsider whether the Association's claim for trespass damages is precluded by America I or America II. Id. at 179-80. On remand, the Bankruptcy Court held a nine-day trial and, thereafter, issued an opinion holding (in relevant part) that (1) the Associations' claims for trespass and/or damages against Clambakes were not precluded by the America litigation; (2) Clambakes was not a trespasser between March 1, 1998 and April 8, 2005 because the Associations consented to its operation of the Regatta Club on the Reserved Area; and (3) Clambakes trespassed between April 8, 2005 and November 5, 2005, but the Associations' damages were limited to the $450,000 that was already paid by the Chapter 11 trustee,

pursuant to the August 25, 2005 consent order. In re IDC Clambakes, 431 B.R. at 58-62.

On appeal to this Court, the Associations contend that (1) the Bankruptcy Court's determination that the Associations consented to Clambakes use and occupancy was clearly wrong; (2) even if the Associations had impliedly consented, such implied consent would give rise to an implied obligation to pay; (3) the bankruptcy court abused its discretion in permitting certain testimony; and (4) the Bankruptcy Court erred in considering extra-record evidence, appended to Clambakes' post-trial memorandum. In its cross-appeal, Clambakes argues that the Bankruptcy Court erred in determining that Clambakes had trespassed between April 8, 2005 and November 5, 2005. Clambakes also advances two alternative arguments, to be taken up if the Court does not uphold the Bankruptcy Court's consent determination: (1) that the Bankruptcy Court erred in finding that the Associations had constructive possession of the North Unit; and (2) that the Bankruptcy Court erred in holding that the Associations' demand for trespass damages was not precluded by the doctrine of issue preclusion.

II. Standard of Review

This Court reviews the Bankruptcy Court's factual findings for clear error, Thunberg v. Wallick (In re Thunberg), 641 F.3d 559, 560 (1st Cir. 2011), and its conclusions of law are

7

reviewed de novo. Gannett v. Carp (In re Carp), 340 F.3d 15, 21 (1st Cir. 2003).

Under the clear error standard of review, this Court will only set aside the Bankruptcy Court's findings of fact where, in light of the whole record, the Court "form[s] a strong, unyielding belief that a mistake has been made." Id. at 22 (quoting Cumpiano v. Banco Santander, 902 F.2d 148, 152 (1st Cir. 1990)). The Bankruptcy Court's findings will be upheld so long as it follows that the Bankruptcy Court's findings are supportable on any reasonable view of the record. See Boroff v. Tully (In re Tully), 818 F.2d 106, 109 (1st Cir. 1987).

III. Discussion

    A.   Trespass between March 1, 1998 and April 8, 2005

The Bankruptcy Court concluded that Clambakes did not trespass from March 1, 1998 to April 8, 2005 because the Associations consented to its use and occupancy of the Reserved Area. On appeal, the Associations contend that the Bankruptcy Court fundamentally misapprehended the record as a whole and that its finding of consent to Clambakes' use and occupancy is clearly wrong.

A trespasser is "[o]ne who intentionally and without consent or privilege enters another's property." Bennett v. Napolitano, 746 A.2d 138, 141 (R.I. 2000) (emphasis added) (quoting Ferreira v. Strack, 652 A.2d 965, 969 (R.I. 1995)).

8

"Consent is willingness in fact for conduct to occur. It may be manifested by action or inaction and need not be communicated to the actor." Restatement (Second) of Torts § 892 (1979). "If words or conduct are reasonably understood by another to be intended as consent, they constitute apparent consent and are as effective as consent in fact." Id. More specifically with respect to apparent consent:

> Even when the person concerned does not in fact agree to the conduct of the other, his words or acts or even his <u>inaction</u> may manifest a consent that will justify the other in acting in reliance upon them. This is true <u>when the words or acts or silence and inaction, would be understood by a reasonable person as intended to indicate consent and they are in fact so understood by the other</u>. . . . On the other hand, <u>if a reasonable person would not understand</u> from the words or conduct that consent is given, the other is not justified in acting upon the assumption that consent is given even though he honestly so believes; and there is then no apparent consent.

Id. at § 892, cmt. c (emphasis added).

While the Restatement describes the "[e]xistence of apparent consent [a]s a fact issue," id. at § 892, reporter's note, cmt. c, the Bankruptcy Court's consent determination is more properly viewed as a mixed question of law and fact. Mixed questions of law and fact "invok[e] a sliding standard of review . . . ." Braunstein v. McCabe, 571 F.3d 108, 124 (1st Cir. 2009). The applicable standard "varies depending upon the nature of the mixed question; the more fact-dominated it is, the more likely that deferential, clear-error review will obtain,

9

and the more law-dominated it is, the more likely that non-deferential, de novo review will obtain." Sierra Fria Corp. v. Donald J. Evans, P.C., 127 F.3d 175, 181 (1st Cir. 1997); see also Fidelity & Guar. Ins. Co. v. Star Equip. Corp., 541 F.3d 1, 5 (1st Cir. 2008). In the present case, it is clear that the Bankruptcy Court's consent determination was fact-dominated and is accordingly reviewed for clear error. See Sierra Fria, 127 F.3d at 181.

The Bankruptcy Court determined that, "throughout the seven year term of Clambakes' management and operation of the Regatta Club, the Associations manifested numerous actions (and inactions) signaling apparent consent to Clambakes' possession and operation of the Regatta Club." In re IDC Clambakes, 431 B.R. at 60. In support of this determination, the Bankruptcy Court relied on the following findings of fact. First, Clambakes was not added to the Tolling Agreement or to any subsequent extensions. Id.

Second, during the construction, licensing, and approval process, the Associations only raised concerns over parking. Id. More specifically, the Bankruptcy Court quoted from Debtor's Exhibit 63, a letter from Raymond Morrissette, President of the America Condominium Association, to the Building Inspector for the City of Newport, in which Mr. Morrissette stated: "While we don't have a particular objection

as to the land use with respect to the building itself, we do have a substantial problem with the parking requirements for that bldg., [sic] as well as for other commercial parking on and around that site." Id. The Bankruptcy Court also noted that there was no objection to the City's transfer of the liquor license for Clambakes' use at the Regatta Club. Id.

Third, Clambakes was not a party to the America litigation, and "while Clambakes is charged with knowledge of its existence, given that its sole shareholder [Roos] was a named Defendant, the Associations gave no indication of their intent to withdraw their apparent consent for Clambakes to continue operating the Regatta Club pending the outcome of the suit against its lessor, Properties." Id. Fourth, both Harbor Houses, one of the Associations, and various individual unit owners contracted directly with the Regatta Club to host private events. Id. Fifth, there was no written or verbal notice, signage, or any other type of claim made against Clambakes to quit the premises. Id.

One of the Associations arguments on appeal is that the Bankruptcy Court improperly considered evidence that was not part of the trial record. By way of background, at the conclusion of trial, the Bankruptcy Court requested that the parties file post-trial memoranda. Appended to Clambakes' post-trial memorandum was a 712 page volume of what it termed

11

"Composite Exhibits." It is undisputed that some of these composite exhibits were not part of the record at trial; it is also undisputed that Associations never moved to strike or otherwise object to these exhibits before the Bankruptcy Court.

"[O]nce the record is closed, a [trial] court, absent waiver or consent, ordinarily may not receive additional factual information of a kind not susceptible to judicial notice unless it fully reopens the record and animates the panoply of evidentiary rules and procedural safeguards customarily available to litigants." Lussier v. Runyon, 50 F.3d 1103, 1105-06 (1st Cir. 1995); see also id. at 1113 ("It is a fundamental principle of our jurisprudence that a factfinder may not consider extra-record evidence concerning disputed adjudicative facts."). Those procedural safeguards "include, but are not limited to, the right to object to evidence, the right to question its source, relevance, and reliability, the right to cross-examine its proponent, and the right to impeach or contradict it." Id. at 1113 n.13.

In the normal course, if a party desires to supplement the record, it files a motion to reopen the record for the consideration of additional evidence, which the court would consider by assessing a variety of factors. See, e.g., Davignon v. Hodgson, 524 F.3d 91, 114 (1st Cir. 2008); Blinzler v.

Marriott Int'l, Inc., 81 F.3d 1148, 1160 (1st Cir. 1996).[2] Here, by contrast, such a motion was neither made by Clambakes nor entertained sua sponte by the Bankruptcy Court. Rather, the extra-record evidence was surreptitiously appended to Clambakes' post-trial filing.

It is true that parties are expected to thoroughly review all submissions by opposing counsel and vigilantly pursue any available objections. And here, there is no doubt that the Associations failed in that regard. They received a copy of Clambakes' post-trial composite exhibits on December 4, 2008 and never objected, moved to strike, or otherwise complained about the inclusion of non-record evidence until well after the Bankruptcy Court's decision was on appeal to this Court. In fact, it would appear that the Associations did not bring the issue to the Court's attention until they filed their September 30, 2010 reply brief.

In Lussier, the court sustained a "preserved objection" and determined that there was "no basis for finding that the parties waived this deprivation, consented to the court's shortcut, or

---

[2] "While the court's decision turns on flexible and case-specific criteria, among the facts the district court should consider are 'whether (1) the evidence sought to be introduced is especially important and probative; (2) the moving party's explanation for failing to introduce the evidence earlier is bona fide; and (3) reopening will cause no undue prejudice to the non-moving party.'" Davignon v. Hodgson, 524 F.3d 91, 114 (1st Cir. 2008) (quoting Rivera-Flores v. Puerto Rico Tel. Co., 64 F.3d 742, 746 (1st Cir. 1995) (citation omitted)).

otherwise invited judicial reliance on the extra-record 'proof.'" 50 F.3d at 1113, 1115. While there was certainly no preserved objection here, and a colorable argument could be made that the Associations' silence and inaction constituted a waiver of the issue, to consider this issue waived would only reward Clambakes' brazen attempt to sneak new evidence into the record and incentivize litigation by subterfuge. Accordingly, the Court must determine whether the Bankruptcy Court's consent determination was "premised on this late-arriving evidence" or is sufficiently supported by evidence that was properly in the record. See id. at 1115 ("To the extent that the judgment is premised on this late-arriving evidence, it cannot stand.").

As framed by the Associations, the real issue is whether the court relied on Composite Exhibit P in arriving at its consent finding. Composite Exhibit P contains a small excerpt of Raymond Morrissette's testimony before the Bankruptcy Court on July 5, 2005. The following exchanges were underscored in the transcript appended to Clambakes' post-trial memorandum:

> Q   And you on behalf of unit owners are saying to the building official that you don't have any objection to the land use with respect to the building.
>
> A   Because counsel had advised us not to try and stop a business.
>
>     . . . .

>    Q    So your attorneys were advising you that the business was a separate issue as opposed to who owns the ground, correct?
>
>    A    We just didn't want to get into a separate contest of stopping the business.
>
>    Q    So you made a conscience [sic] decision based on advice of counsel not to interfere with the institution or the conduct of business on that property.
>
>    A    That's correct.

(Composite Ex. P, In re: IDC Clambakes, Inc., (Bankr. D.R.I. Dec. 4, 2008), BK No. 05-12267, ECF No. 671-5.)

Although that testimony was provided before the Bankruptcy Court, it was not provided during the trial of this matter, not made an exhibit during the trial, and was therefore not properly part of the record for the Bankruptcy Court's consideration. Yet, while the Associations accurately argue that the Morrissette testimony contained in Composite Exhibit P is (very) frequently cited in Clambakes' reply brief on appeal, it is <u>never</u> cited or quoted in the Bankruptcy Court's decision. And frankly, it strikes the Court that Composite Exhibit P is so significant that, had the Bankruptcy Court considered it, it unquestionably would have cited and quoted from it extensively to support its ultimate conclusion as to consent. There is simply no suggestion that the Bankruptcy Court's consent determination was "premised on this late-arriving evidence." See <u>Lussier</u>, 50 F.3d at 1115.

Having determined that the Bankruptcy Court's finding on consent was not based upon or tainted by its consideration of extra-record evidence, it still remains for this Court to assess whether that finding was clearly erroneous. The arguments of the parties boil down to a disagreement over what could reasonably be inferred from the record evidence of the Associations' actions (or inactions). The Associations argue that it was illogical and clearly wrong for the Bankruptcy Court to find that the Associations had consented at the same time that the parties had engaged in hard-fought litigation and a bitter dispute over title to the Reserved Area. They further argue that the only appropriate interpretation of their words and conduct was that they were pursuing their claims in court, while refraining from self-help. Clambakes, on the other hand, argues that the Bankruptcy Court appropriately relied on a record that reflects nonfeasance and deliberate inaction on the part of the Associations.

In support of its contention that the consent determination was erroneous, the Associations argue that the Bankruptcy Court misconstrued the evidence upon which it relied. Without engaging each and every contention of the Associations, it suffices to say that these arguments go to the character and weight of the evidence; and, such determinations are best left to the finder of fact. See United States v. Young, 105 F.3d 1,

5 (1st Cir. 1997) ("Deference to the [trial] court's findings of fact reflects our awareness that the trial judge, who hears the testimony, observes the witnesses' demeanor and evaluates the facts first hand, sits in the best position to determine what actually happened.").

Moreover, while the Associations attempt to pick apart the Bankruptcy Court's assessment of individual pieces of evidence and related findings of fact, it is clear that the Bankruptcy Court's decision rested on the record, <u>as a whole</u>, presented at trial. And looking at that record on appeal, it is apparent that this is a close case on the facts, with evidence supporting the arguments of both sides.

A fair reading of the record supports the view that, from a factual standpoint, Clambakes either thought Properties owned the Reserved Area and Clambakes' use and occupancy was pursuant to a lease, or it thought that its possession was contested due to the pendency of the <u>America</u> litigation. On the other hand, the record also supports the view that, as to Clambakes' operation of the Regatta Club, the Associations essentially sat back and allowed Clambakes to build and operate a thriving business. At the end of the day, while it may be true that one could fairly interpret the record as the Associations suggest, the Court cannot form "a strong, unyielding belief that a mistake has been made." <u>Gannett</u>, 340 F.3d at 22 (quoting

Cumpiano, 902 F.2d at 152).[3]  The Bankruptcy Court's determination that the Associations' deliberate inaction in the face of the construction and operation of a large, thriving business, coupled with the affirmative actions of Harbor Houses and individual unit owners who patronized the Regatta Club, could be "reasonably understood by another to be intended as consent," Restatement (Second) of Torts § 892, is supportable on a reasonable view of the record.[4]  See Boroff, 818 F.2d at 109.

---

[3] As to the Associations' argument with respect to Exhibit EE, even if the Bankruptcy Court abused its discretion in not admitting it, that decision was harmless error. The Bankruptcy Court's consent determination rested on a pattern of inaction (and affirmative action) that had nothing to do with a purported misapprehension of the scope of the America litigation.

[4] The Associations argue in the alternative that, even if this Court sustains the Bankruptcy Court's consent determination, implied consent necessarily gives rise to an implied obligation to pay fair value of the benefit received. In support of this proposition, the Associations cite four Rhode Island Supreme Court cases and the Restatement (Third) of Restitution.  The cases cited by the Associations do not involve implied consent in a trespass context but rather involve implied contracts.  And the portion of the Restatement that the Associations cite pertains to "Trespass, Conversion, and Comparable Wrongs." See Restatement (Third) of Restitution § 40 (2011).  Since a trespasser is "[o]ne who intentionally and without consent or privilege enters another's property," Bennett v. Napolitano, 746 A.2d 138, 141 (R.I. 2000) (emphasis added) (quoting Ferreira v. Strack, 652 A.2d 965, 969 (R.I. 1995)), and the Court has sustained the consent determination, Clambakes was not a trespasser during the period in question, and this portion of the Restatement is not applicable.  Most importantly, this argument was not raised before the Bankruptcy Court below and is, accordingly, not properly before this Court on appeal.

B.   Trespass between April 8, 2005 and November 5, 2005

In the Bankruptcy Court's decision, the court held that, "<u>even without argument on the issue</u>, the conclusion is mandatory that, as of April 8, 2005, the Associations' apparent consent ended, that, by operation of law Clambakes became a trespasser upon the Reserved Area, and that said trespass continued until Clambakes vacated the premises on November 5, 2005." <u>In re IDC Clambakes</u>, 431 B.R. at 61 (emphasis added).  The court then went on to determine that the appropriate measure of damages for that period of time was limited to the $450,000 that was already paid by the Chapter 11 trustee, pursuant to the August 25, 2005 consent order.  On appeal, Clambakes contends that this determination was erroneous because the Associations' proofs of claim do not encompass this time period.

A review of the record suggests that Clambakes is correct. The proofs of claim submitted by the Associations clearly contain the following: "2. Date debt was incurred: 1998 – April 7, 2005."  The Associations' brief to this Court suggests that there is no disagreement as to the scope of their proofs of claim: "On October 3, 2005, the Condominium Associations filed timely proofs of claim seeking the fair value of the Debtor's pre-Petition use and occupancy of the Reserved Area and the improvements thereon for the period from 1998 to April 8, 2005 (the 'Claim Period')." (<u>See</u> Assoc. Brief 10, ECF No. 11.)

Furthermore, in its Reply Brief to this Court, the Associations do not contest (or respond in any manner) to Clambakes' assertion that their claims did not encompass the period of time in question. And finally, this Court conducted a thorough review of the entire Bankruptcy Court record and could find no suggestion that the claim period had been somehow expanded or amended.

Accordingly, the question of whether Clambakes trespassed after April 7, 2005 was simply not before the Bankruptcy Court,[5] and that determination is hereby vacated.

IV. Conclusion

For the reasons set forth in this opinion,[6] the decision of the Bankruptcy Court is AFFIRMED in part and VACATED in part.

IT IS SO ORDERED.

*/s/ William E. Smith*
William E. Smith
United States District Judge
Date: April 10, 2012

---

[5] Clambakes made clear during the hearing before this Court that they do not contend that they are entitled to the return of any of the $450,000 that was already paid. Accordingly, resolution of this particular question on appeal has no monetary impact on either party.

[6] Having affirmed the Bankruptcy Court's decision on the basis of its consent determination, the Court need not consider the issues raised in the alternative by Clambakes.